UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>        v.<br><br>KING CHUEN TANG, ET AL.,<br><br>                Defendants.<br>_____ / | No. C-09-05146 JCS<br><br>**ORDER DENYING MOTION TO DISQUALIFY COUNSEL FOR MING SIU [Docket No. 204]** |

## I.      INTRODUCTION

The Securities and Exchange Commission ("SEC") brings a Motion to Disqualify Counsel for Ming Siu ("Motion") seeking disqualification of Defendant Ming Siu's counsel in this action, Fenwick and West LLP ("Fenwick") on the basis that Fenwick's former representation of Defendant Zisen Yu ("Yu") in this action creates a "direct, actual, and profound" conflict.  The parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. § 636(c).  The Court finds that the Motion is suitable for determination without oral argument, pursuant to Civil Local Rule 7-1(b).  Accordingly, the Court vacates the December 9, 2011 hearing on the instant motion.[1]  For the reasons stated below, the Motion is DENIED.

## II.     BACKGROUND

### A.      Fenwick's Joint Representation of Siu and Yu During Pre-Suit Investigation

On October 30, 2009, the SEC filed this action alleging that Yu, Ming Siu ("Siu"), Chen Tang, Joseph Seto, Ronald Yee, and James Tang engaged in insider trading in the stock of Acxiom

---

[1] The hearing set for the same date on the parties' summary judgment motions shall remain on calendar.

Corporation ("Acxiom") in April 2007 and the stock of Tempur-Pedic International, Inc. ("Tempur") in March 2008. In the pre-suit investigation that led up to the action, Fenwick represented both Yu and Siu. In particular, Fenwick presented and defended both Yu and Siu in their testimony before the SEC and in the preparation of their written "Wells Submissions" to the SEC. *See* Declaration of Jason C. Rogers in Support of Plaintiff's Motion to Disqualify Counsel for Defendant Ming Siu ("Rogers Motion Decl."), Ex. A (excerpt of transcript of July 10, 2008 testimony of Zisen Yu), B (excerpt of transcript of July 11, 2008 testimony of Ming Siu), C (Wells Submission of Yu), D (Wells Submission of Siu).

On June 6, 2008, Yu entered into an Engagement Agreement and Conflict Waiver (the "2008 Conflict Waiver"). Declaration of Ilana S. Rubel in Opposition to SEC's Motion to Disqualify Counsel ("Rubel Decl.") ¶ 2, Ex. A. This agreement states, in part, as follows:

**Joint Representation/Conflict Waiver**

This portion of the letter concerns Fenwick's potential joint representation of you and Ming Siu ("Mr. Siu"). If you agree to the joint representation as set forth in this letter, you will be waiving certain rights you have, and the Firm therefore asks that you read this letter carefully before signing it, and that you also consider consulting an independent lawyer to review it on your behalf.

The focus of this portion of the letter is to set out the terms under which the Firm would represent both you and Mr. Siu and to describe what would happen if that joint defense were no longer possible. Based on the information that has been provided to us, the Firm does not believe that our joint representation would involve any actual conflict of interest. As we understand the facts currently, both you and Mr. Siu have expressed an interest to present a unified defense using one set of lawyers. Joint representation of two or more individuals, as is discussed in this letter, may result in economic or tactical advantages. It can also result in lower legal costs.

However, joint representation may result in potentially divided or at least shared attorney-client loyalties. Although the Firm is not currently aware of any actual or reasonably foreseeable adverse effects of such divided or shared loyalty, it is possible that issues may arise as to which our representation of you may be materially limited by our representation of Mr. Siu.

Also, joint representation of multiple individuals has important implications with respect to any confidences shared with this Firm. For example, under governing law and under the terms of the waiver set out in this letter, any confidence shared by one joint client with this firm can be disclosed to any of the other jointly represented clients. Thus, if you have confidences that are important to your defense in this matter and do not wish those confidences to be shared with other joint clients the Firm would represent, then a joint defense may be inappropriate for you. Moreover, governing law and this waiver letter provide that if a dispute or lawsuit were later to arise between jointly represented parties, communications made in confidence to this Firm during the course of the joint representation would not be privileged from the other joint parties.

2

> If you or the Firm eventually discovers evidence of facts that lead you or the Firm to believe that a joint defense and joint representation were no longer possible or appropriate, then the joint representation would be terminated. Should that occur, we will endeavor to apprise you promptly of any such conflict so that you can decide whether you wish to obtain independent counsel. If the joint defense is no longer tenable, it is the Firm's intent that it will continue to represent you and not Mr. Siu, even if that means that the representation of you would be adverse to Mr. Siu or any other joint party.

Rubel Decl., Ex. A.

### B. The Parallel Criminal Case

In March 2010, Assistant United States Attorney ("AUSA") Jonathan Schmidt from the U.S. Attorney's Office in the Northern District of California informed Fenwick attorney Christopher Steskal that he was conducting a parallel criminal investigation. Declaration of Christopher J. Steskal in Opposition to SEC's Motion to Disqualify Counsel ("Steskal Decl."), ¶ 3. AUSA Schmidt sent Fenwick an "FBI 302" memorializing a February 2010 interview of Chen Tang. *Id*. The FBI 302 stated that Tang was interviewed during a joint meeting with SEC trial counsel Jason Rodgers, the FBI, and AUSA Schmidt. *Id*. According to the FBI 302, Tang claimed that he provided inside information relating to both Tempur and Acxiom to Siu, Yu, and Joseph Seto. *Id*. AUSA Schmidt informed Steskal that Tang was cooperating with the government. *Id*.

On April 15, 2010, Tang pled guilty to insider trading pursuant to a plea agreement ("Tang Plea Agreement") with the U.S. Attorney's Office. Steskal Decl. ¶ 5, Ex. A. In the plea agreement, Tang agreed that the following facts were true:

> From October 2007 to April 2008, I worked as the Chief Financial Officer for [private equity fund Friedman, Fleischer and Lowe, LLC ("FFL")]. FFL was a large shareholder of Tempur when it went public in 2003. By the time I joined FFL in 2007, FFL had sold its Tempur holdings. However, an FFL partner sat on the board of Tempur, and was privy to inside information about Tempur. Tempur stocks trade on the New York Stock Exchange.
>
> In March, 2008, Tempur's board of directors decided to pre-announce, ahead of its scheduled April 17, 2008, earning announcement, that it would miss its earning forecast. The pre-announcement was scheduled for March 17, 2008. This information was material non-public information.
>
> On or about March 12, 2008, through my work at FFL, I learned that Tempur would be making a pre-announcement. I then told Joseph Seto, Ming Siu, and Zisen Yu about Tempur's pre-announcement. On March 13 and March 14, 2008, Seto, Siu, Zisen Yu and I took advantage of this inside information and purchased short positions in Tempur by selling Tempur securities short and purchasing put option contracts. . . .

3

> On March 17, 2008, after the pre-announcement, FFL approved the purchase of up to $50 million of Tempur securities starting on March 19, 2008. Through my work at FFL, I learned this material, non-public information. I then shared this information with Joseph Seto, Ming Siu, and Zisen Yu. Between March 17, 2008 and March 19, 2008, Seto, Siu, Zisen Yu, and I took advantage of this insider information and purchased Tempur securities. . . .
>
> Ronald Yee is my brother-in-law. Starting in 2005, Ronald Yee was the Chief Financial Officer of Value Act. In April, 2007, Value Act began to consider submitting a bud to acquire Acxiom. This information was material non-public information. . . .In April, 2007, Ronal Yee and I had a conversation about the stocks in the ValueAct portfolio. In that conversation, Ronald Yee told me that now would be a good time to buy Acxiom stock. . . . I shared this information with Joseph Seto, Ming Siu, and Zisen Yu. . . .

*Id*. Tang also agreed to "cooperate with the U.S. Attorney's Office before and after" sentencing, including the following:

    a.    I will respond truthfully and completely to any and all questions bput to me, whether in interviews, before a grand jury or at any trial or other proceeding;

    b.    I will provide all documents and other materials asked for by the government;

    c.    I will testify truthfully at any grand jury, court or other proceeding as requested by the government;

    d.    I will surrender any and all assets acquired or obtained directly or indirectly as a result of my illegal conduct;

    e.    I will request continuances of my sentencing date, as necessary, until my cooperation is completed;

    f.    I will not reveal my cooperation, or any information related to it, to anyone without prior consent of the government;

    g.    I will participate in undercover activities under the supervision of law enforcement agents or the U.S. Attorney's Office.

*Id*. Tang further agreed that if he failed to comply with any promises in the plea agreement, the government would be released from all of its promises but Tang would not be released from his guilty plea. *Id*. Finally, Tang agreed that the plea agreement was binding *only* on the U.S. Attorney's Office for the Northern District of California and not on "any other federal, state, or local agency." *Id*.

In May 2010, Fenwick referred Yu to Ramsey & Ehrlich LLP for counsel regarding "his options with respect to the criminal case, including whether there was a factual basis to enter a cooperation plea agreement like Mr. Tang and cooperate with the government by providing testimony." Steskal Decl.,. ¶ 6. Also in May 2010, Yu signed a Supplemental Engagement

4

Agreement and Conflict Waiver (the "2010 Supplemental Conflict Waiver"), which stated, in part, as follows:

> As discussed, based on our understanding of the various matters we have been handling for you and Mr. Siu, the Firm believes that there is a potential conflict of interest between you and Mr. Siu in connection with an Information recently filed by the Department of Justice in the Northern District of California, captioned *United States v. Tang*, Case No. 10-cr-0080 (the "DOJ Litigation"). At present, neither of you nor Mr. Siu has been named as defendants in this action. However, as you know, the DOJ has informed us that it is considering the possibility of naming one or both of you as defendants. As discussed, if the DOJ Litigation proceeds against you and/or Mr. Siu, the Firm believes that it would not be in the best interests of either of you or Mr. Siu to represent both of you and Mr.Siu in this matter. As such, the Firm reserves the right to disengage from its representation of either you or Mr. Siu in connection with the DOJ Litigation, or the matter of *Securities and Exchange Commission v. King Chuen Tang, et al.,* Case No. 3:09-cv-5146 JCS, currently pending in the Northern District of California, or any other matter related to our current representation of you and Mr. Siu, at the Firm's sole discretion, in the event that you and/or Mr. Siu are named as defendants in the DOJ Litigation.

Rubel Decl. ¶ 3, Ex. B.

**C.     The Emergence of a Conflict and Fenwick's Motion to Withdraw**

In September 2010, Yu's criminal counsel, Ramsey & Ehrlich, informed Fenwick that Yu intended to plead guilty pursuant to a cooperation plea agreement. Steskal Decl. ¶ 7. Consequently, Fenwick sent a letter to Yu on October 6, 2010 notifying him that an actual conflict of interest had developed between Yu and Siu and therefore, pursuant to the 2008 Conflict Waiver and the 2010 Supplemental Conflict Waiver, Fenwick was terminating its representation of Yu. Rubel Decl., Ex. C.

On November 29, 2010, Fenwick filed a motion seeking to withdraw from representation of Yu (the "Motion to Withdraw"). Dkt. No. 145. In the Motion to Withdraw, Fenwick stated, in part, as follows:

> The Civil Action involves allegations that the defendants engaged in insider trading. The relief defendants, comprising the defendants' investment funds and family members, are alleged to have received proceeds from the defendants' alleged insider trading. At present, the Firm jointly represents Yu and ACP (an investment fund of which Yu is the general partner) (collectively, the "Yu Defendants") and Ming Siu, Sylvia Tsui, Doi Ping Siu, Yuen-Lai Ma and Leung-Kee Siu (Ming Siu's wife, sister and parents, respectively) (collectively, the "Siu Defendants") in the Civil Action.
>
> On February 2, 2010, the Department of Justice ("DOJ") filed an Information in this Court captioned *United States v. Tang*, 3:10-cr-00080-J, charging defendant Chen Tang with insider trading and conspiracy (the "Criminal Action"). On April 16, 2010, this Court entered a Plea Agreement between Chen Tang and the DOJ. Since February, 2010, the Civil Action

5

> and the Criminal Action have proceeded in parallel. Chen Tang is currently scheduled to be sentenced in the Criminal Action on December 16, 2010, before Judge Jeffrey S. White.
>
> Yu has retained the legal services of Ismail Ramsey ("Ramsey") of Ramsey & Ehrlich LLP to represent him in the Criminal Action. Based on the Firm's conversations with Ramsey, the Firm believes that there is a present conflict of interest between the Yu Defendants and the Siu Defendants and the Firm can no longer represent them both in the Civil Action. Ramsey has also informed the Firm that he is not prepared to assume representation of the Yu Defendants in the Civil Action as of the filing of this motion.

Motion to Withdraw at 1-2. The Court held a series of *ex parte* hearings to address the Motion to Withdraw, on January 7, 2011, January 14, 2011, February 18, 2011, and March 4, 2011. In the course of those hearings, Fenwick provided the Court with copies of the original and amended engagement letters and conflict waivers with Yu. Rubel Decl., Ex. D at 10-13. The Court ultimately granted Fenwick's Motion to Withdraw on March 7, 2011. Docket No. 155.

According to Siu, Fenwick has been representing him on a pro bono basis since June 2011 because he was terminated from his job as a certified public accountant in May 2008, after the SEC contacted his employer, and he had exhausted his savings by early 2011. Declaration of Ming Siu in Opposition to Security and Exchange Commission's Motion to Disqualify Counsel ("Siu Decl."), ¶¶ 3-4. Siu states in his declaration that he is "not currently able to pay for defense counsel" and does "not have alternate counsel willing to represent [him] in this matter on a pro bono basis." *Id*., ¶ 5.

### D.   Yu's Plea Agreement

On June 22, 2011, the U.S. Attorney's Office filed an Information against Yu and another cooperating defendant in this case (Joseph Seto) charging them with one count of conspiring to engage in insider trading. Steskal Decl. ¶ 9, Ex. B. On September 8, 2011, Yu entered into a plea agreement ("Yu Plea Agreement") that stated, in part, as follows:

> I am friends with Joseph Seto, Ming Siu, and Chen Tang. We would often talk about the market, stocks, and trading. Together we were members of two partnerships in which we share brokerage accounts. . . . In 2004, with Seto and Tang, I became a member of American Pegasus Long Short Fund Partnership. In 2006, with Seto, Siu, and Tang, I became a member of Acceleration Capital Partners.
>
> On or about March 12, 2008, through his work at . . .[FFL], Chen Tang learned that Tempur-Pedic International, Inc. (Tempur) was planning a pre-announcement. Chen Tang provided that material and non-public information to Joseph Seto, Ming Siu, and me. On March 13 and March 14, 2008, the four of us took advantage of this information by selling Tempur securities short and by purchasing "put" option contracts . . .

6

> On March 17, 2008, after the pre-announcement, FFL approved a plan to buy up to $50 million of Tempur securities, starting on March 19, 2008. Through his work at FFL, Tang learned of this material, non-public information, and shared it with Joseph Seto, Ming Siu, and me. Between March 17, 2008 and March 19, 2008, the four of us once again took advantage of this inside information by purchasing Tempur securities.

Declaration of Theis Finlev in Opposition to Plaintiff SEC's Motion to Disqualify Counsel ("Finlev Decl."), Ex. E. The Yu Plea Agreement contains the same provision as the Tang Plea Agreement with respect to cooperation with the U.S. Attorney's Office. *Id.* Further, the Yu Plea Agreement, like the Tang Plea Agreement, is binding only on the U.S Attorney's Office for the Northern District of California and not on "any other federal, state, or local agency." *Id.*

### E.     The Yu Deposition

In July 2001, Fenwick notified the SEC's Jennifer Brandt and Jason Rogers that it wished to schedule a deposition of Yu. Finlev Decl., ¶ 2. On August 9, 2011, Fenwick noticed Yu's deposition for August 31, 2011 at Fenwick's offices. Finlev Decl., ¶ 3 & Ex. B. The parties then agreed to postpone Yu's deposition until after his guilty plea, "in large part so that his plea agreement could be used during the examination and so that he would not be forced to invoke his Fifth Amendment rights during the examination." *Id.* ¶ 4, Ex. C. On September 9, 2011, Fenwick noticed Yu's deposition for September 29, 2011 at Fenwick's office. *Id.* ¶ 5 & Ex. D. Fenwick obtained Yu's September 9, 2011 plea agreement for the first time when the SEC used it as an exhibit during Siu's deposition. *Id.* ¶ 6 & Ex. E.

At the deposition, the SEC was represented by Jason Rodgers. Rogers Decl., ¶ 2 & Ex. E. Yu was represented by Ismail Ramsey. *Id.*, Ex. E. at 5. The deposition was conducted by Fenwick attorney Alexis Caloza, with Christopher Steskal also present. *Id.* During the deposition, Ramsey and Rogers expressed concern about a potential conflict. *Id.* at 114-115. Counsel discussed the question off the record and agreed that any objections arising relating to the duties of loyalty and confidentiality owed by Fenwick to Yu would be preserved. *Id.*

According to Ismail Ramsey, at the end of the day, he requested that Fenwick provide him with copies of any waivers Yu had signed in connection with Fenwick's joint representation of Yu and Siu. Declaration of Ismail Ramsey ("Ramsey Decl.), ¶ 12. The next day, Fenwick forwarded to Ramsey copies of the 2008 Conflict Waiver, the 2010 Supplemental Conflict Waiver and an

engagement agreement dated April 7, 2008.[2] *Id*. Ramsey, in turn, emailed the documents to Jennifer Brandt at the SEC. *Id*., ¶ 13. Although the Yu deposition was scheduled to continue on October 5, 2011, Ramsey advised the parties that Yu would not appear until the concerns about a potential conflict had been resolved. *Id*., ¶ 14.

### F. The Motion

In the Motion, the SEC contends that due to Yu's confession to the criminal charges asserted against him, in which he "directly implicates Siu in the insider trading conspiracy," Fenwick faces an actual conflict because it "owes a duty to Siu to use its best efforts to undermine Yu's credibility, but [it] cannot attempt to do so without violating continuing duties owed to its former client, . . . which Yu never waived." Motion at 1. According to the SEC, under similar circumstances Judge Hamilton granted a motion to disqualify in *United States v. Tae Son Lee*, Case No. CR 10- 0352, 2011 U.S. Dist. LEXIS 100973, * 2-3 (N.D. Cal. Sept. 8, 2011). *Id*. at 9.

The SEC contends that the actual conflict in this case became apparent at Siu's September 29, 2011 deposition, when Fenwick attempted to use Yu's Wells submission and investigative testimony against him, placing Yu in a position of having to admit that he had lied to Fenwick and the SEC. *Id*. at 10- 18. In doing so, the SEC asserts, Fenwick breached its duty of loyalty and confidentiality to Yu. *Id*. The SEC further contends that Fenwick breached these duties by questioning Yu about a conversation with the SEC in which Fenwick had advised Yu to decline to answer on Fifth Amendment grounds, thus posing a "real and certain risk of subjecting him to potential criminal liability under 18 U.S.C. § 1001." *Id*. at 19. Finally, the SEC asserts that Fenwick harmed its current client, Ming Siu, to the extent that it refrained from vigorously cross-examining Yu as to the truth of the statements in his plea agreement, apparently out of reluctance to discredit its former client. *Id*. at 19-20

The SEC asserts that in order to continue to represent Ming Siu in the face of the actual conflict that has now developed, Fenwick would have had to have obtained informed written consent from Yu at the time that it sought to withdraw as his counsel while continuing to represent Ming Siu

---

[2]The April 7, 2008 Engagement Agreement does not address the potential conflict of interest arising out of Fenwick's joint representation of Siu and Yu.

8

and that Fenwick failed to do so. *Id*. at 20. In particular, the SEC contends that the 2010 Supplemental Conflict Waiver signed by Yu in May 2010 was Fenwick's only attempt to obtain a waiver from Yu and that it was inadequate because it did not inform Yu of the "actual and reasonably foreseeable adverse consequences" to Yu, as is required for a valid waiver. *Id*. at 20-21 (citing Rule 3-310(E) of the California Rules of Professional Conduct").

The SEC argues that it has standing to seek Fenwick's disqualification, even though it is neither a current nor former client of Fenwick's, because the alleged ethical breach "so infects the litigation . . . that it impacts the [SEC's] interest in a just and lawful determination of [its] claims." *Id*. at 23 (citing *Colyer v. Smith*, 50 F. Supp. 2d 966, 972 (C.D. Cal. 1999)). Further, the SEC contends, any standing objection Fenwick may assert is overcome by the Court's inherent obligation to manage the conduct of attorneys appearing before it. *Id*. (citing *Colyer* and *Wheat v. United States*, 486 U.S. 153, 161 (U.S. 1988)).

### G. Opposition

Fenwick argues that the SEC's Motion was filed purely for strategic reasons in order to deprive Ming Siu of counsel just months before trial, knowing that he will be unable to obtain comparable representation on a pro bono basis if Fenwick is disqualified. Opposition at 13. Fenwick contends, moreover, that the SEC has failed to meet the heavy burden that must be met to justify disqualification of opposing counsel for several reasons.

First, Fenwick rejects the SEC's reliance on *Colyer* in support of its position that is has standing based on an alleged conflict between Fenwick and Yu. *Id*. at 13-16 (citing *Colyer*, 50 F. Supp. 2d at 972). According to Fenwick, the SEC relies on dicta in *Colyer* while ignoring the holding in the case, namely, that the plaintiff *lacked* standing to assert a conflict on behalf of a third party because he had no personal stake in the alleged breach of loyalty. *Id*. at 13-14 (citing *Colyer*, 50 F. Supp. 2d at 972-973). According to Fenwick, the holding in *Colyer* applies equally in this case.

Second, Fenwick argues that the SEC waived any objection to its representation of Ming Siu by waiting almost a year after Fenwick first identified the conflict and staying silent, even when Fenwick notified it of its intent to depose Yu. *Id*. at 17. Fenwick asserts that "[a]lthough the SEC

1  feigns surprise that Fenwick examined Yu and asked him questions about the positions he took
2  before the SEC in 2008, it was patently obvious to all parties at the time of Fenwick's withdrawal
3  that, given that Yu was pleading guilty to insider trading and volunteering to be a cooperating
4  government witness, Fenwick would have to examine him at some point to determine what his
5  testimony would be at trial and the extent to which it differed from his prior testimony to the SEC."
6  *Id*. at 17-18.  Fenwick also contends that the prejudice to Siu of disqualifying Fenwick would be
7  extreme because of the pending summary judgment proceedings and the unlikeliness that he would
8  be able to find pro bono counsel willing to jump into the case at this late date.  *Id*. at 18-19.

9         Third, Fenwick rejects the SEC's assertion that Yu did not waive the alleged conflict,
10 arguing that the 2010 Supplemental Conflict Waiver signed by Yu in May 2010 is entirely in line
11 with the leading California case on joint representations, *Zador Corp. v. Kwan*, 31 Cal. App. 4th
12 1285 (1995), a case that the SEC cited but did not discuss in the Motion.  *Id*. at 19.  Moreover, the
13 SEC's reliance on Judge Hamilton's decision in *United States v. Tae Son Lee* is misplaced, Fenwick
14 argues, because in that case there was no conflict waiver of any sort, the parties were truly adverse,
15 and the case was a criminal case, thus involving constitutional and prudential issues that are not
16 raised here.  *Id*. at 22 n. 23.

17        Fourth, Fenwick argues that the SEC's specific allegations regarding unwaived conflicts are
18 baseless.  *Id*. at 22.  In particular, according to Fenwick, Yu's truthful testimony in this case is not
19 adverse to Siu because although "Yu has admitted that he traded on inside information . . . he will
20 not testify that he told Siu about inside information, or that he was aware of anyone telling Siu about
21 inside information."  *Id*.  Because Yu's "many admittedly truthful statements to the SEC"
22 demonstrate that his testimony corroborates Siu's defense, the SEC is incorrect in its assertion that
23 Fenwick must impeach Yu and call him a liar, Fenwick argues.  *Id*.  Nor has Fenwick placed Yu at
24 risk of criminal liability under 18 U.S.C. § 1001 or perjury based on statements he made to the SEC
25 in 2008 given that any such charges are waived under the plea agreement with Yu, according to
26 Fenwick.  *Id*. at 23.  In fact, Fenwick argues, "Yu is obligated under his plea agreement to truthfully
27 admit any prior false statements to the SEC to get credit for cooperation."  *Id*.  Fenwick also argues
28 that the SEC, while taking the position that Fenwick has breached its duty of confidentiality to Yu,

10

1 has failed to identify any specific confidences that were breached. *Id*. Finally, Fenwick argues that
2 the SEC is incorrect in its assertion the Fenwick did not vigorously examine Yu regarding his plea
3 agreement. *Id*. Rather, Fenwick contends that at the deposition of Yu, it "clarified that Yu has no
4 evidentiary basis to claim that Siu knowingly participated in an insider trading conspiracy." *Id*.

Finally, Fenwick asks that the Court to issue an order to show cause why sanctions should not be imposed on the SEC for bringing the instant motion, arguing that it is presented for an improper purpose, legally unwarranted and lacking in evidentiary support. *Id*. at 25 (citing Fed. R. Civ. P. 11(c)(3)).

### H. Reply

In its Reply, the SEC argues that the Motion is timely because the hearings regarding Fenwick's Motion to Withdraw were *ex parte* and the SEC did not have access Fenwick's conflict waivers until after Yu's deposition, on October 2, 2011, when Yu's criminal counsel, Ismail Ramsey passed on to the SEC the documents given to him by Fenwick relating to Yu's conflict waiver. Reply at 1-2. In particular, SEC attorney Jennifer Brandt states in a declaration accompanying the Reply brief that when she asked Christopher Steskal on October 11, 2011 (after the SEC had already received the documents provided by Fenwick to Ramsey) to produce "any documents evidencing a waiver by Ming Siu," she was told by Steskal that "he was not aware of any authority that would permit the SEC to raise the conflict issue or make that request." *Id*. at 2 (citing Declaration of Jennifer Brandt in Support of Plaintiff's Motion to Disqualify Counsel for Defendant Ming Siu ("Brandt Decl."), ¶ 7). Thus, the SEC contends, "an inquiry by the [SEC] as to Yu's waivers, whether raised when Fenwick sought to withdraw or at any other time, would have been met by the same resistance." *Id*.

The SEC further asserts that it has standing, arguing that *Colyer* allows a non-client to bring a motion to disqualify where a breach "impacts the party's interest in a just and lawful determination of her claims." *Id*. at 6 (citing *Colyer*, 50 F. Supp. 2d at 971).

The SEC rejects Fenwick's argument that there is no actual adversity between Yu and Siu, arguing that Yu's version of events, as stated in the plea agreement, and Siu's defense, conflict in significant respects. *Id*. at 9. As a result, the SEC argues, by questioning Yu about his former

11

statements, Fenwick is putting its former client at risk because, "[w]ere Fenwick's view to prevail, the court in the criminal case could conclude that Yu 'provided false information or testimony' when he entered the plea agreement, a finding that could release [the United States Attorney's Office for the Northern District of California] from its obligations under the plea agreement." *Id*. at 9.

Finally, the SEC argues that *Zador v. Kwan* is not on point factually and therefore does not establish that Yu's waiver was valid. *Id*. at 12. Further, the SEC contends, even under the standard articulated in *Zador*, Yu did not give informed consent to the conflict because Fenwick did not disclose the nature of the risk, namely, that a conflict could arise that would harm Yu in this case or in a criminal proceeding. *Id*. at 14-15. The SEC points out in this respect that in the 2008 Conflict Waiver, Fenwick stated that it would continue to represent *Yu* and not Siu if a conflict arose. *Id*.

## III. ANALYSIS

### A. Legal Standards Governing Disqualification of Counsel

Federal courts in California look to state law to decide motions to disqualify. *Openwave Systems Inc. v. Myriad France S.A.S.*, 2011 WL 1225978, at *1 (N.D.Cal., March 31, 2011) (citing *In re County of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000)). Pursuant to Rule 11-4 of the Civil Local Rules of the Northern District of California, attorneys practicing in this district are required to adhere to "the standards of professional conduct required of members of the State Bar of California," which are contained in "the State Bar Act, the Rules of Professional Conduct of the State Bar of California and decisions of any court." Civ. L.R. 11–4 and comment; *see also Visa U.S.A., Inc. v. First Data Corp.,* 241 F.Supp.2d 1100, 1103 (N.D.Cal., 2003).

Under California law, "the propriety of disqualification depends on the circumstances of the particular case in light of competing interests." *The Oaks Mgmt. Corp. v. Sup. Ct.*, 145 Cal. App. 4th 453, 464-65 (2006) (citing *William H. Raley Co. v. Sup. Ct.*, 149 Cal. App. 3d 1042, 1048 (1983)). "The court must weigh the combined effects of a party's right to counsel of choice, an attorney's interest in representing a client, the financial burden on a client of replacing disqualified counsel and any tactical abuse underlying a disqualification proceeding against the fundamental principle that the fair resolution of disputes within our adversary system requires vigorous representation of parties by independent counsel unencumbered by conflicts of interest." *Raley*, 149

12

Cal. App. 3d at 1048. However, "[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar." *People v. SpeeDee Oil Change Systems, Inc.*, 20 Cal.4th 1135, 1145 (1999). Thus, "[t]he important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process." *Id*.

The right to disqualify counsel is within the discretion of the trial court as an exercise of its inherent powers. *Visa U.S.A., Inc. v. First Data Corp.*, 241 F.Supp.2d at 1103 (citing *United States v. Wunsch*, 84 F.3d 1110, 1114 (9th Cir.1996); *Image Technical Serv., Inc. v. Eastman Kodak Co.*, 820 F.Supp. 1212, 1215 (N.D.Cal.1993); and Cal.Code Civ. Proc. § 128(a)(5)). Because motions to disqualify are often tactically motivated, they are strongly disfavored and are subjected to "particularly strict judicial scrutiny." *Optyl Eyewear Fashion Intern. Corp. v. Style Companies, Ltd.*, 760 F.2d 1045, 1050 (9th Cir. 1985)(citation omitted).

### B.   Whether the SEC has Standing to Bring a Motion to Disqualify

The SEC asserts that it has standing to challenge Fenwick's representation of Siu, even though it is not a current or former client, because the ethical violation at issue "so infects the litigation in which disqualification is sought that it impacts the moving party's interest in a just and lawful determination of her claims." Motion at 23 (citing *Colyer*, 50 F.Supp. 2d at 972). While the Court agrees that *Colyer* allows a party to bring a motion to disqualify based on a duty owed by counsel to a third party under limited circumstances, those circumstances do not exist here and therefore the SEC does not have standing to bring the instant motion.

In *Colyer*, the court addressed whether a plaintiff had standing to bring a motion to disqualify counsel for the defendant on the basis that the representation placed the firm in conflict with the interests of a former client. *Colyer*, 50 F. Supp. at 969. Noting that the question of whether a non-client may bring such a motion is unresolved in the Ninth Circuit, the court conducted an extensive review of the case law of other jurisdictions. *Id*. at 969-971. The court concluded that the "majority view is that only a current or former client of an attorney has standing to complain of that attorney's representation of interests adverse to that current or former client." *Id*. (citing *In re Yarn Processing Patent Validity Litig.*, 530 F.2d 83, 88 (5th Cir.1976), ("[a]s a general rule, courts do not

13

1  disqualify an attorney on the grounds of conflict of interest unless the former client moves for
2  disqualification")). The court recognized that the majority view makes an exception to the general
3  rule "where the ethical breach so infects the litigation in which disqualification is sought that it
4  impacts the moving party's interest in a just and lawful determination of her claims," noting that
5  "[i]n such a case . . the prudential barrier to litigating the rights and claims of third parties . . .would
6  be overcome by the court's inherent obligation to manage the conduct of attorneys who appear
7  before it and to ensure the fair administration of justice." *Id*. at 971.

8  Following the majority approach, the court in *Colyer* held that under the general rule, the
9  plaintiff in that case did not have standing to seek disqualification and further, that the exception did
10 not apply. *Id*. The court reasoned that "an attorney can have no sufficiently personal 'injury in
11 fact' based on the conflict status of her opposing counsel to move to disqualify that adversary." *Id*.
12 The court continued, "a generalized attorney interest in the integrity of the legal system [is]
13 insufficient . . .to support standing in an attorney to move to disqualify opposing counsel." *Id*. at
14 972. The Court further found that the plaintiff's "interest in the administration of justice is
15 insufficiently concrete and particularized to support a finding of standing here. The alleged
16 conflict—if it exists—simply does not rise to the level where it infects the proceedings and threatens
17 Colyer's individual right to a just determination of his claims."*Id*. at 973.

18 In the wake of *Colyer*, courts in this district and others have relied on the general rule
19 articulated in *Colyer* to find a lack of standing on the part of non-client litigants seeking
20 disqualification of another party's counsel. *See, e.g., Cantanella v. Stovitz*, 2004 WL 2648284, *2
21 (N.D. Cal. Sept. 13, 2004) (no standing); *Andrews Farms v. Calcot, LTD*., 2010 WL 4010146
22 (E.D.Cal., Oct. 13, 2010); *Kabins Family Ltd. Partnership v. Chain Consortium*, 2011 WL 1299986
23 (D.Nev., March 31, 2011). Conversely, many district courts have invoked the exception articulated
24 in *Colyer* to find that a non-client had standing to seek disqualification based on a conflict with a
25 third party. *See, e.g., Concat LP v. Unilever, PLC,* 350 F.Supp.2d 796, 818 (N.D.Cal.2004)
26 (holding that non-client had standing where alleged conflict arose out of concurrent representation
27 and third party had formerly had an ownership interest in the company that was seeking
28 qualification); *Decaview Dist. Co., Inc. v. Decaview Asia Corp.,* 2000 WL 1175583, at *4 (N.D.Cal.

Aug.14, 2000) (holding that non-client could bring a motion to disqualify where moving party's confidential information was in the possession of opposing counsel as a result of a prior representation by opposing counsel); *Dimenco v. Service Employees Intern. Union*, 2011 WL 89999 (N.D.Cal., January 10, 2011) (holding that in action brought by union members under the Labor Management Relations Act, union had standing to bring motion to disqualify based on alleged conflict arising out of representation of union members by firm that concurrently represented an entity adverse to the union in a separate action because, under the LMRDA, union members assert claims in a representative capacity on behalf of the union).

This court finds the reasoning of *Colyer* to be persuasive and therefore applies the majority rule that generally, a party seeking disqualification based on a conflict must be or have been a client. Further, having carefully reviewed the cases that have applied that rule – as well as those that have invoked the exception – the Court concludes that the facts here do not establish standing on the part of the SEC. Courts have invoked the exception in *Colyer* where particular facts have established that the party seeking disqualification had a personal stake beyond the general interest in the fair administration of justice. For example, in *Decaview*, cited by the SEC, the party seeking disqualification had a personal interest because the counsel whose disqualification was sought had confidential information of the moving party in its possession. The Court has found no case that is factually on point with this case, where the *only* personal stake offered by the SEC is its interest in the integrity of the legal system. Accordingly, the Court concludes that the exception in *Colyer* does not apply and that under the general rule articulated in that case, the SEC does not have standing to bring a motion to disqualify based on the alleged conflicts arising out of Fenwick's former representation of Yu.

### C. Whether the SEC Waived its Right to Object to Fenwick's Representation of Ming Siu

The SEC contends that the instant motion is timely because an actual conflict did not become apparent until Yu was deposed, in September 2011. Because the conflict that the SEC now contends requires disqualification was entirely foreseeable at the time Fenwick initially sought to withdraw from its representation of Yu, in November 2010, and because the prejudice resulting from the

15

SEC's delay is substantial, the Court concludes that even if the SEC had standing to object, its objection has been waived.

It is "well settled that a former client who is entitled to object to an attorney representing an opposing party on the ground of conflict of interest but who knowingly refrains from asserting it promptly is deemed to have waived that right." *Trust Corp. of Montana v. Piper Aircraft Corp.*, 701 F. 2d 85, 87 (9th Cir. 1983). In determining whether delay is sufficient to give rise to waiver, the court should consider not only the length of the delay but also "such factors as when the movant learned of the conflict; whether the movant was represented by counsel during the delay; why the delay occurred, and in particular whether the motion was delayed for tactical reasons; and whether disqualification would result in prejudice to the nonmoving party." *Employers Ins. of Wausau v. Albert D. Seeno Const. Co.*,692 F.Supp. 1150, 1165 (N.D.Cal.,1988).

Here, Fenwick raised the issue of a conflict arising out of the representation of Siu when it sought to withdraw from its representation of Yu, in November 2010. At that time, the SEC knew that there was an "actual" conflict of interest and, as disclosed on the public record, that Yu's counsel had been in discussions with the U.S. Attorney's office. Nonetheless, throughout the prolonged series of ex parte hearings regarding Fenwick's withdrawal, the SEC did not seek Fenwick's disqualification. Nor did the SEC seek to obtain from Fenwick the conflict waivers that it now asserts are inadequate. The Court rejects the SEC's assertion that its failure to request those documents does not support a finding of waiver because Fenwick would have resisted such a request if made. The SEC could, at minimum, have alerted the Court of its concern so that the Court could have considered the issue when it reviewed the evidence offered by Fenwick in connection its request to withdraw. The SEC failed to do so.

The Court also finds that the prejudice that arises out of the SEC's delay is severe. The Court is currently considering summary judgment motions and trial is only months away. Fenwick is intimately familiar with the facts of this case and is representing Siu on a pro bono basis. Even assuming that Siu would be able to obtain pro bono counsel to replace Fenwick in time to substitute in for trial, it is highly unlikely, under these circumstances, that he would receive representation of the caliber offered by Fenwick.

Accordingly, the Court finds that the SEC has waived any objection it may have to Fenwick's representation of Siu.

### D.     Successive Representation and Whether Yu Gave Informed Written Consent

Even assuming the SEC has standing to bring the instant motion and has not waived its objection, the Motion fails on the merits because Yu gave informed written consent, resulting in waiver.

Rule 3-310(E) of the California Rules of Professional Conduct states: "A member shall not, without the informed written consent of the client or former client, accept employment adverse to the client or former client where, by reason of the representation of the client or former client, the member has obtained confidential information material to the employment." A former client can establish that an attorney violated these duties by showing that (1) the attorney is acting adversely to the former client and (2) a "substantial relationship" exists between the subjects of the current and the former engagements. *Flatt v. Superior Court*, 9 Cal. 4th 275, 283 (1994).  Here, the parties do not dispute that there is a  "substantial relationship" between Fenwick's former representation of Yu and its current representation of Siu.  Rather, they dispute whether: 1) Fenwick's representation of Siu is adverse to Yu; and 2) whether Yu gave informed written consent to representation of Siu.  Because the Court finds that Yu gave informed written consent, it does not decide whether Fenwick's representation of Siu is adverse to Yu.[3]

In *Zador Corp. v. Kwan*, 31 Cal. App. 4th 1285 (1985), the court addressed the question of consent in the context of conflicts arising out of successive representation. In that case, the Heller Ehrman firm jointly represented the purchaser of a property (Zador Corp.) and the purchaser's agent (Kwan) in a dispute with the seller over the value of the property. 31 Cal. App. 4th at 1289.  At the outset of the litigation, Heller Ehrman had represented the family that owned Zador Corp. for about

---

[3]While the Court does not decide whether Fenwick's representation of Siu is adverse to Yu, it finds  that the positions of both Fenwick and SEC on this question appear to be somewhat overstated. For the purposes of this motion, it is sufficient to note that the Court cannot definitively conclude that Fenwick's representation of Siu is *not* adverse to Yu.  Therefore, the Court assumes without deciding that it is adverse to Yu.

17

10 years. *Id*. at 1288-1289. When Heller Ehrman agreed to represent Kwan, Kwan signed a conflict agreement that stated, in part, as follows:

> Based on the information that has been provided to us, we do not believe that our representation currently involves any actual conflict of interest. You should be aware, however, that our representation may in the future involve actual conflicts of interests if the interests of the Co-defendants become inconsistent with your interests. Should that occur, we will endeavor to apprise you promptly of any such conflict so that you can decide whether you wish to obtain independent counsel.
>
> Multiple representation may result in economic or tactical advantages. You should be aware, however, that multiple representation also involves significant risks. First, multiple representation may result in divided or at least shared attorney-client loyalties. Although we are not currently aware of any actual or reasonably foreseeable adverse effects of such divided or shared loyalty, it is possible that issues may arise as to which our representation of you may be materially limited by our representation of the Co-defendants.
>
> Furthermore, because we will be jointly retained by both you and the Co-defendants in this matter, in the event of a dispute between you and the Co-defendants, the attorney-client privilege generally will not protect communications that have taken place among all of you and attorneys in our firm. Moreover, pursuant to this 'Joint Client' arrangement, anything you disclose to us may be disclosed to any of the other jointly represented clients.
>
> In the event of a dispute or conflict between you and the Co-defendants, there is a risk that we may be disqualified from representing all of you absent written consent from all of you at that time. We anticipate that if such a conflict or dispute were to arise, we would continue to represent the subsidiary companies of Miramar Hotel & Investment Co., Ltd. (the 'Companies'), whose legal interests in this matter are aligned, notwithstanding any adversity between you and the Companies' interests. Among the Companies are Zador (California) Corporation, Zador Corporation N.V. and YCS Investments. Accordingly, we are now asking that you consent to our continued and future representation of the Companies and agree not to assert any such conflict of interest or to seek to disqualify us from representing the Companies, notwithstanding any adversity that may develop. By signing and returning to us the agreement and consent set forth at the end of this letter, you will consent to such arrangement and waive any conflicts regarding that arrangement. Notwithstanding such waiver and consent, depending on the circumstances, there remains some degree of risk that we would be disqualified from representing any of you in the event of a dispute.

*Id*. at 1290.

Initially, Kwan and Zador Corp. took the position in litigation that the property was worth less than the purchase price, and Kwan endorsed interrogatories asserting as much. *Id*. at 1291. During the course of the litigation, however, Heller Ehrman obtained information suggesting that there might be an actual conflict of interest. *Id*. at 1291. At that point, Heller Ehrman met with Kwan and recommended that he retain separate counsel; Kwan, in turn, reaffirmed his consent to Heller Ehrman's continued representation of Zador. *Id*. A letter confirming that conversation

1 stated, "Consistent with your agreement and consent dated June 22, 1990, which you have recently
2 reaffirmed, we will continue to represent the Co-defendants in this lawsuit." *Id*. Soon after the
3 conversation, Kwan retained separate counsel. *Id*. Subsequently, Heller Ehrman learned that Kwan
4 had conspired with the sellers to defraud Zador Corp., withdrew from its representation of Kwan,
5 amended its complaint to add Kwan as defendant, and used the interrogatory response that it
6 prepared for Kwan as an admission by Kwan that the property was worth less than its purchase
7 price. *Id*. at 1300. Kwan brought a motion to disqualify Heller Ehrman from representing Zador
8 Corp. in its suit against Kwan, and the trial court granted the motion. *Id*. at 1292. The Court of
9 Appeal reversed, holding that the trial court abused its discretion. *Id*. at 1303.

The Court of Appeal held that Kwan had consented to Heller Ehrman's continued representation of Zador Corp. under California Rules of Professional Conduct 3-310(c). *Id*. at 1301. In reaching its conclusion, the court relied on the original conflict agreement that was signed by Kwan and subsequently reaffirmed, stating as follows:

> Kwan consented to Heller's continued representation of Zador. The waiver and consent form was detailed. Kwan agreed not to disqualify Heller "*notwithstanding any adversity that may develop*." (Italics added.) When adversity did develop, Kwan obtained separate counsel but reaffirmed his agreement to the consent form and to Heller's continued representation of Zador

*Id*. at 1301. The court rejected Kwan's argument that he did not consent because he did not believe "any adversity" included being sued. *Id*. The court found that in situations involving former joint clients, "'any adversity' quite naturally includes litigation." *Id*. The court further noted that "California law does not require that every possible consequence of a conflict be disclosed for a consent to be valid." *Id*. (citation omitted).

Here, as in *Kwan*, Yu signed a conflict waiver as a condition of representation, waived the confidentiality of any attorney-client communications as between the joint clients, agreed that if a dispute arose between joint clients, then communications made in confidence would not be privileged as between the joint clients, agreed and consented that the joint representation may result in divided client loyalties, acknowledged and agreed that a potential conflict of interest might develop that would limit or compromise their representation, and agreed and acknowledged that in the event of an actual conflict of interest between the joint clients, the joint representation would

19

become inappropriate and their respective counsel could withdraw from their representation and continue with the representation of the joint client. Further, the 2008 Conflict Waiver and 2010 Supplemental Conflict Waiver adequately disclosed the "reasonably foreseeable risks" of joint representation. Indeed, the 2010 Supplemental Conflict Waiver expressly says that a conflict would result if Yu were named as a defendant in the parallel criminal action, as the SEC contends has occurred.

Accordingly, the Court concludes that under *Zador Corp. v. Kwan*, Yu consented to the joint representation, including any conflict that has arisen as a result of Fenwick's continued representation of Siu after withdrawing from its representation of Yu.

## IV. CONCLUSION

For the reasons stated above, the Motion is DENIED.

IT IS SO ORDERED.

Date: November 28, 2011

_____
JOSEPH C. SPERO
United States Magistrate Judge

20